EDWARD SHUKIS *v.* BOARD OF EDUCATION OF REGIONAL DISTRICT NUMBER 17 ET AL.
(AC 29915)

DiPentima, Gruendel and Lavery, Js.*

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

Argued October 22, 2009—officially released July 20, 2010

*Keith R. Ainsworth,* for the appellant (plaintiff).

*Kevin M. Godbout,* with whom were *Erin L. Golem-biewski, Robert S. Bystrowski* and, on the brief, *Frank H. Santoro, Jonathan A. Kocienda* and *Michael R. McPherson,* for the appellees (named defendant et al.).

*Opinion*

LAVERY, J. This appeal addresses the degree to which expert testimony is required to defeat summary judgment in an environmental pollution case when multiple defendants have violated the underlying wetland regulatory scheme. The plaintiff, Edward Shukis, appeals from the judgment rendered following the trial court's granting of the motions for summary judgment filed by the defendants, Regional District No. 17 Haddam-Killingworth board of education (board), the town of Haddam (town), M.R. Roming Associates, P.C. (Roming), and Sideco Construction Company (Sideco), as to all counts of his complaint.[1] On appeal, the plaintiff claims that the court improperly granted the defendants' motions for summary judgment because the court failed (1) to apply the appropriate regulatory permit standard of care under the Connecticut Environmental Protection Act of 1971 (CEPA), General Statutes § 22a-14 et seq., and the Inland Wetlands and Watercourses Act (wetlands act), General Statutes § 22a-36 et seq., (2) to graft this regulatory permit standard of care onto the complaint's nuisance and negligence counts, and (3) to find sufficient evidence of a breach of the standard of care and the subsequent causation of harm to allow the case to proceed to a trial on the

---

[1] Although the court also granted the town's motion for summary judgment, the plaintiff does not challenge on appeal the court's findings with regard to the town. Thus, we refer to only Roming, Sideco and the board as the defendants in this appeal.

merits. Additionally, the plaintiff claims that the court abused its discretion in not allowing his experts to supplement their disclosures during discovery fifteen months prior to trial. We reverse in part the judgment of the court granting the defendants' motions for summary judgment and, consequently, need not reach the evidentiary issue regarding supplemental expert disclosures.

The record reveals the following facts and procedural history. The plaintiff owns a parcel of real property located at 33 Little City Road in Higganum. A two acre pond is located on the plaintiff's property. Ponset Brook flows into the pond from the south and then continues to flow out over a stonework dam at the northern end of the pond. When the plaintiff purchased the property, the pond was clear, and the surface was free of vegetation. The pond served not only as a visual asset of the plaintiff's property but was also used for swimming, fishing and other recreation.

The buildings, grounds and athletic fields of Regional District No. 17 Haddam-Killingworth High School, located at 91 Little City Road in the town, abut the western boundary of the plaintiff's property and are situated directly uphill from the pond. The school property is comprised of 41.5 acres. The board hired Roming, a landscape architecture and land planning firm, and Sideco, a construction company, to complete the renovation and construction of athletic fields on the high school grounds. Roming was responsible for the planning, monitoring, oversight and remedial action regarding siltation and runoff from the construction site, while Sideco was to perform the actual renovation and construction work. In the summer of 2000, construction activities began on the high school grounds.

Beginning on August 28, 2000, the plaintiff expressed his concerns over the amount of sediment running into

his pond from the school construction site. On numerous occasions, the plaintiff contacted Cynthia Williams, a zoning and wetlands enforcement officer for the town, the board and Sideco to complain about failed siltation fences, an ineffective sediment berm, the intentional slitting by Sideco of siltation fabric on storm drain basins and the buildup of iron bacteria in an intermittent stream that flows downhill from the school property into his pond. In response to the plaintiff's complaints, site visits by Williams, engineering firms, Sideco and Roming confirmed that the erosion and sediment control measures were failing. Further investigation revealed a plume of sediments in the pond where the small brook from the school property discharged into the pond. Whether by direct or indirect means, storm water on 36.8 acres of the school property flows into the pond—storm water from seventeen acres of the 36.8 total acres drains directly into the pond.

Despite a notice of violation of the town's zoning regulations issued by Williams to Sideco due to failed erosion and sediment control measures, as well as a subsequent cease and desist order issued to the board, large quantities of storm water runoff containing silt, rocks, bacteria and other waterborne substances continued to flow from the school property into the plaintiff's pond and surrounding wetlands. Since construction activities began, not only has a considerable amount of sediment flowed into the pond, but murky water, iron floc on the pond's surface and sizeable beds of rooted aquatic plants have also appeared.

On June 16, 2005, the plaintiff filed his third amended complaint, alleging sixteen separate counts against the defendants. In response, the defendants filed motions to strike a number of those counts. After the court's granting of Roming's motion to strike, the plaintiff's

CEPA and negligence counts against Roming remained.[2] After the court's granting of Sideco's motion to strike and the subsequent filing of substitute counts, the plaintiff alleged a violation of CEPA, negligence and private and public nuisance counts against Sideco. Against the board, which did not file a motion to strike, the plaintiff alleged a violation of CEPA, negligence and public and private nuisance counts.

The defendants filed motions for summary judgment as to all remaining counts against them. Roming argued that it was entitled to judgment as a matter of law because the plaintiff failed to adduce requisite expert evidence to support liability—including the plaintiff's failure to disclose an expert who would opine that Roming departed from an applicable standard of care. Alternatively, Roming argued that summary judgment should be granted because the plaintiff failed to adduce requisite expert evidence to establish causation under the plaintiff's legal theories.

Similarly, Sideco argued that the court should grant its motion for summary judgment because the plaintiff failed to disclose an expert to testify as to the standard of care Sideco owed in connection with the design, implementation and maintenance of erosion and sedimentation control measures on the high school grounds—a key point that Sideco argued was the crux of the plaintiff's complex environmental claims. Furthermore, Sideco argued that the plaintiff could not establish that there was any causal relationship between an alleged breach, or unreasonable conduct,

---

[2] Although it does not appear from the record that the court rendered judgment on the stricken counts; see Practice Book § 10-44; this appeal, nonetheless, was taken from a final judgment because the plaintiff did not replead the stricken counts, and the remaining counts were disposed of by way of motions for summary judgment. See *Yancey* v. *Connecticut Life & Casualty Ins. Co.*, 68 Conn. App. 556, 557 n.1, 791 A.2d 719 (2002).

and the damage allegedly sustained to the plaintiff's pond and surrounding wetlands.

In support of its motion for summary judgment, the board argued that the plaintiff failed to establish that his property suffered unreasonable pollution, impairment or a destruction of the public trust in the water or natural resources of the state. Because the plaintiff could not produce sufficient evidence to demonstrate that the siltation of his pond was continuous, unreasonable or the proximate cause of any added plant growth, the board asserted that the court should grant its motion for summary judgment on all counts against it. Thus, although the defendants filed separate motions for summary judgment, their grounds coalesce around the assertion that the plaintiff lacked expert testimony to establish a breach of a standard of care owed by the defendants that caused damage to the plaintiff's pond.

The plaintiff filed memoranda in opposition to each of the defendants' motions for summary judgment. The court characterized the plaintiff's evidence accumulated in opposition to summary judgment as vast and expansive.[3] Nonetheless, on July 24, 2008, the court issued a memorandum of decision granting the motions for summary judgment in favor of the defendants. The court disposed of all remaining counts against the defendants by granting these motions.

With respect to Roming, the court determined that the plaintiff had not disclosed expert testimony as to either the standard of care governing its work or the causation of damages required to prove negligence. The court stated that in a case such as this, in which the allegations involve claims of environmental damage due to the failure of the architects to design and to supervise

[3] The court listed, in footnote 11 of its memorandum of decision, the twenty-three pieces of evidence that the plaintiff submitted in opposition to the defendants' motions for summary judgment.

the project properly, expert testimony is essential—especially with regard to causation, because the relationship between Roming's improper design and supervision of the project and the pollution of the pond is a matter beyond the average juror's expertise and understanding. In addressing the CEPA count, the court similarly found insufficient expert testimony to show that Roming's conduct caused or contributed to the alleged pollution of the pond.

The court granted the motion for summary judgment in favor of Sideco on the negligence and CEPA counts for the same reasons it granted Roming's motion for summary judgment. The court then went on to address the plaintiff's public and private nuisance counts against Sideco. The court concluded that none of the evidence offered by the plaintiff was in the form of an expert opinion, and, therefore, he could not establish a genuine issue of material fact as to whether Sideco's use of the land was in fact reasonable and whether its actions interfered with a public right. As a result, the court granted Sideco's motion for summary judgment on the nuisance counts because the fact finder would not be provided with evidence as to what reasonable erosion and sedimentation controls are necessary during the reconstruction of athletic fields. Furthermore, the court noted that the expert evidence required to prove causation also was missing.

With respect to the board, the court again relied on the absence of an evidentiary nexus between the board's alleged negligent supervision and the ultimate pollution to the pond. Because the court found that there was a fatal absence of expert evidence as to causation, the court granted the board's motion for summary judgment on the negligence count. For the same reason, the absence of expert evidence showing that the board caused harm or damage to the plaintiff, the court also granted summary judgment on the CEPA and nuisance

counts. The plaintiff now appeals from the judgment granting the defendants' motions for summary judgment. Additional facts will be set forth as necessary.

Before turning to the plaintiff's claims, we first set forth our well settled standard of review. "Because the court's decision on a motion for summary judgment is a legal determination, our review on appeal is plenary. . . . Practice Book § [17-49] requires that judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A material fact is a fact that will make a difference in the result of the case. . . . The facts at issue are those alleged in the pleadings. . . .

"In seeking summary judgment, it is the movant who has the burden of showing the nonexistence of any issue of fact. The courts are in entire agreement that the moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which, under applicable principles of substantive law, entitle him to a judgment as a matter of law. The courts hold the movant to a *strict standard*." (Emphasis added; internal quotation marks omitted.) *Tuccio Development, Inc.* v. *Neumann*, 111 Conn. App. 588, 593, 960 A.2d 1071 (2008).

Summary judgment "is appropriate only if a fair and reasonable person could conclude only one way." (Internal quotation marks omitted.) *Dugan* v. *Mobile Medical Testing Services, Inc.*, 265 Conn. 791, 815, 830 A.2d 752 (2003); see also *Miller* v. *United Technologies Corp.*, 233 Conn. 732, 751, 660 A.2d 810 (1995). "The test is whether the party moving for summary judgment would be entitled to a directed verdict on the same facts." (Internal quotation marks omitted.) *Neuhaus* v. *DeCholnoky*, 280 Conn. 190, 199, 905 A.2d 1135 (2006).

"[A] directed verdict may be rendered only where, on the evidence *viewed in the light most favorable to the nonmovant*, the trier of fact could not reasonably reach any other conclusion than that embodied in the verdict as directed." (Emphasis in original; internal quotation marks omitted.) *Dugan* v. *Mobile Medical Testing Services, Inc.*, supra, 815. Thus, to succeed on a motion for summary judgment, "the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. . . . As the burden of proof is on the movant, the evidence must be viewed in the light most favorable to the opponent. . . .

"It is frequently stated in Connecticut's case law that, pursuant to Practice Book §§ 17-45 and 17-46, a party opposing a summary judgment motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. . . . [T]ypically [d]emonstrating a genuine issue requires a showing of evidentiary facts or substantial evidence outside the pleadings from which material facts alleged in the pleadings can be warrantably inferred. . . . Moreover, [t]o establish the existence of a material fact, it is not enough for the party opposing summary judgment merely to assert the existence of a disputed issue. . . . Such assertions are insufficient regardless of whether they are contained in a complaint or a brief. . . . Further, unadmitted allegations in the pleadings do not constitute proof of the existence of a genuine issue as to any material fact." (Internal quotation marks omitted.) *DaGraca* v. *Kowalsky Bros., Inc.*, 100 Conn. App. 781, 785–86, 919 A.2d 525, cert. denied, 283 Conn. 904, 927 A.2d 917 (2007).

"Although the court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion . . . a party may not rely on mere speculation or conjecture as to the true nature

of the facts to overcome a motion for summary judgment. . . . A party opposing a motion for summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue." (Internal quotation marks omitted.) Id., 792.

Last, we note also that "[t]he trial court does not sit as the trier of fact when ruling on a motion for summary judgment. . . . [Its] function is not to decide issues of material fact, but rather to determine whether any such issues exist. . . . On appeal, we must determine whether the legal conclusions reached by the trial court are legally and logically correct and whether they find support in the facts set out in the memorandum of decision of the trial court." (Citation omitted; internal quotation marks omitted.) *Keller* v. *Beckenstein,* 117 Conn. App. 550, 557–58, 979 A.2d 1055, cert. denied, 294 Conn. 913, 983 A.2d 274 (2009).

I

THE CEPA COUNTS

The plaintiff first claims that the court should not have granted the motions for summary judgment filed by Sideco, the board and Roming on the CEPA counts because the court failed to recognize the statutory standard of care for liability under CEPA. Given the application of the inappropriate standard, the plaintiff argues, the court improperly concluded that there was no genuine issue of material fact concerning whether the defendants violated CEPA, as alleged in the complaint. We agree.

General Statutes § 22a-16 provides in relevant part: "[A]ny person . . . may maintain an action in the superior court . . . for declaratory and equitable relief against . . . any person, partnership, corporation, association, organization or other legal entity, acting

alone, or in combination with others, for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction . . . ." In order to establish a prima facie case under § 22a-16, the plaintiff must establish that "the conduct of the defendant, acting alone, or in combination with others, has, or is reasonably likely unreasonably to pollute . . . the public trust in the . . . water of the state." (Internal quotation marks omitted.) *Connecticut Coalition Against Millstone* v. *Rocque*, 267 Conn. 116, 140, 836 A.2d 414 (2003), quoting *Keeney* v. *Old Saybrook*, 237 Conn. 135, 161, 676 A.2d 795 (1996). Section 22a-16 is a part of CEPA and was passed by the legislature to "enable persons to seek redress in the court when someone is [polluting] our environment." Conn. Joint Standing Committee Hearings, Environment, Pt. 1, 1971 Sess., p. 163, remarks of James Wade, counsel for the majority leadership in the House of Representatives; see also *Waterbury* v. *Washington*, 260 Conn. 506, 532, 800 A.2d 1102 (2002).

Our Supreme Court provided guidance as to what constitutes unreasonable pollution in *Waterbury* v. *Washington*, supra, 260 Conn. 557. "[W]hen there is an environmental legislative and regulatory scheme in place that specifically governs the conduct that the plaintiff claims constitutes [unreasonable pollution] under CEPA, whether the conduct is unreasonable under CEPA will depend on whether it complies with that scheme." Id. Our Supreme Court continued in *Waterbury* to state that "[i]n order to read our environmental protection statutes so as to form a consistent and coherent whole, we infer a legislative purpose that those other enactments are to be read together with CEPA, and that, when they apply to the conduct questioned in an independent action under CEPA, they give substantive content to the meaning of the word 'unreasonable' in the context of such an independent action." Id., 559.

"[A] claim under CEPA that conduct causes unreasonable pollution is not the same [however] as a claim that conduct fails to comply with the requirements of other environmental statutes. To illustrate the point, the fact that conduct may be permitted under the relevant environmental statute does not preclude a claim that the activity causes unreasonable pollution under CEPA, as when the alleged pollution exceeds the amount approved in the permit." *Connecticut Coalition Against Millstone* v. *Rocque*, supra, 267 Conn. 140–41. This distinction was discussed further in *Windels* v. *Environmental Protection Commission*, 284 Conn. 268, 293, 933 A.2d 256 (2007), in which the court pointed out that "[u]nder *Waterbury* v. *Washington*, supra, 260 Conn. 557, a determination that the work was required to be, but was not, in compliance with the substantive provisions of the applicable inland wetlands regulations could support a finding that it constituted unreasonable pollution under CEPA."

Thus, in light of our Supreme Court's construction of unreasonable pollution, the issue before us is whether a genuine issue of material fact exists as to whether Sideco, the board and Roming, acting individually or in combination with each other, violated the environmental and regulatory scheme in place to protect the plaintiff's pond as well as the surrounding wetlands. Because issues of material fact exist, we conclude that the court improperly granted the defendants' motions for summary judgment on the CEPA counts.

A

Sideco and the Board

The following additional facts are necessary for the resolution of these claims. On June 12, 2000, the town's wetlands commission issued a permit to the board authorizing the "[r]econstruction of athletic facilities at

the [h]igh [s]chool, including storm drainage improve-ments, creation of a storm water detention basin and other activity in an upland review area in accordance with plans entitled 'Proposed Athletic Facilities Renova-tions' dated May 1, 2000 and prepared by [Roming]." The permit, however, was issued with the following relevant conditions: "Timely implementation and main-tenance of sediment and erosion control measures, as described in Guidelines for Soil Erosion and Sediment Control–Connecticut, Revised 1988 (or more current edition when available), are a condition of this permit. All sediment and erosion control measures must be maintained until all disturbed areas are stabilized. The permittee shall also employ the best management prac-tices, consistent with the terms and conditions of this permit, to control storm water discharges and to other-wise prevent pollution of wetlands and/or water-courses. . . . The [wetlands enforcement officer] is authorized to require additional erosion and sedimenta-tion controls or to modify methods and procedures as may be required by field conditions." Furthermore, a condition of the permit was that "[n]o equipment or material including, without limitation, fill, construction materials, or debris shall be deposited, placed or stored in any wetland or watercourse on or off site unless specifically authorized by this permit."

Following a number of complaints by the plaintiff that silt from the high school grounds was entering his pond, Williams issued a notice of violation of the town's zoning regulations to Sideco on November 1, 2000. Pur-suant to Williams' authority under the General Statutes and the town's zoning regulations,[4] she notified Sideco that the "[f]ailure to properly install [e]rosion and [s]edi-mentation barriers to protect the adjacent pond and wetland as proposed on an onsite inspection done on

---

[4] See General Statutes § 22a-44 (a); Haddam Zoning Regs., §§ 27.8 and 30.2.

October 6, 2000" was in violation of applicable statutory provisions and the town's zoning regulations.[5]

During a period of heavy rain, Williams conducted a follow-up visit to the high school grounds on November 14, 2000. At the site, she witnessed a great deal of brown water rushing downstream headed for the plaintiff's pond. She informed Sideco, by way of a letter dated November 16, 2000, that she was alarmed by the fact that no one on site was evaluating this activity. As a result of the visit, she concluded that the operation must come to a stop to allow Sideco to develop successfully a plan to stop the amount of silt escaping from the construction site and building up in the plaintiff's pond. Accordingly, Williams issued a cease and desist order to the board, the owner of the school property, on November 16, 2000.

The order required the board to discontinue or to remedy the conditions at the high school property that were in violation of § 27.6 (c) of the town's zoning regulations.[6] Specifically, the order listed the following

[5] Following the October 6, 2000 on-site inspection by Williams, Stephanie Shokofsky, a hydrologist and executive director at the Middlesex County Soil and Water Conservation District, Inc., and Jen Dano of Soil Science and Environmental Services, Williams sent a letter to Sideco dated October 16, 2000, that documented her oral request that Sideco make immediate repairs to the erosion and sediment control measures on the school grounds. Specifically, the requested repairs were: (1) the silt that has accumulated in the stream shall be removed as soon as the stream water lowers; (2) silt or sediment from the storm water outfall area also needed to be removed; (3) an additional silt fence as well as hay bales needed to be added to the storm drains that are not currently protected, and they must be maintained on a regular basis; (4) hay bales or a silt fence needed to surround the perimeter of all stockpiles, topsoil, etc.; and (5) any unprotected soil should be hayed and seeded. The letter, which Williams attached to the notice of violation, concluded by stating that "I hope we are all on the same page and would like to see [the plaintiff's pond] affected as little as possible, and I hope this further action will prove successful in limiting the amount of sedimentation run-off into the pond."

[6] Section 27.6 (c) of the Haddam zoning regulations provides: "The developer/owner shall be responsible for maintaining all erosion and sediment control measures and facilities in proper working order throughout the life of the project."

conditions that needed to be remedied before construc-
tion operations could continue: "[1] [e]xposed areas of
soil and dirt have not been seeded as per plan, [2] [a]ll
stock piles have not been rimmed with siltation fence
by [Sideco] as per plan, [3] [t]he installation of hay bales
and geotextile filter fabrics have not been installed at
ALL catch basins [and] [4] [e]rosion and [s]ediment
control repairs were not carried out according to
[plan] . . . ."

Notwithstanding the cease and desist order, erosion
and sediment controls on the school grounds continued
to require attention. In response to additional com-
plaints filed by the plaintiff throughout 2001, Williams
and Barbara Dworetzky, a natural resource specialist
at the Middlesex County Soil and Water Conservation
District, Inc., conducted two site visits on September
18 and October 3, 2001, to determine whether additional
erosion and sediment control measures were war-
ranted.

Following the inspections, Dworetzky stated that
storm water had eroded the exposed sediment on the
site and deposited it in the stream that leads from the
site to the plaintiff's pond. She observed the stream
flowing over the silt fences and hay bales that had been
put in place to prevent the sediment from traveling
downstream. Additionally, Dworetzky also stated that
fabric covering the drains on the site, which discharge
water to detention basins as well as directly to the
surrounding wetlands, had previously been slit inten-
tionally by Sideco to allow water to enter the drains
unimpeded. As a result, sediment from exposed fields
could freely enter the drain, flow into the stream and
subsequently into the plaintiff's pond. On the basis of
these site observations, as well as remedial recommen-
dations provided by Dworetzky, Williams sent Sideco
a letter stating that the following items required future
attention: cleaning out the streambed of sediment and

siltation and removing the silt fences and hay bales; cleaning and removing any sediment collected around the storm basin; and adding double silt fences three feet apart near both storm drainage basins adjacent to the storage shed.

In the CEPA counts against the defendants, the plaintiff alleged that none of the defendants had applied for, or were granted, any permit that would allow discharge to the inland wetlands or watercourses in the state, and, consequently, the defendants were in violation of the town's inland wetlands regulations and the wetlands act. The plaintiff asserts that the illegal and ongoing discharge of storm water, silt, iron bacteria, rocks, topsoil and other materials into the wetlands located on the plaintiff's property, and the resultant filling of those wetlands, constitute unreasonable pollution of, and injury and impairment to, the public's trust in the wetlands and natural resources of the state.

In this case, the wetlands act and the town's zoning regulations are to be read in conjunction with CEPA because they apply to the conduct alleged in this action[7] and provide substantive content in determining what constitutes unreasonable pollution. See *Waterbury* v. *Washington*, supra, 260 Conn. 557–59, 559 n.33. The purpose of the wetlands act is to "protect the citizens of the state by making provisions for the protection, preservation, maintenance and use of the inland wetlands and watercourses by minimizing their disturbance and pollution . . . preventing damage from erosion, turbidity or siltation . . . [and for] protecting the quality of wetlands and watercourses for their conservation, economic, aesthetic, recreational and other public and private uses and values . . . in order to forever guarantee to the people of the state, the safety of such natural

[7] Under General Statutes § 22a-38, ponds are watercourses and, therefore, are subject to regulation under the wetlands act.

resources for their benefit and enjoyment and for the benefit and enjoyment of generations yet unborn." General Statutes § 22a-36. Pursuant to General Statutes § 22a-44 (a), if the zoning and wetlands enforcement officer of the town "finds that any person is conducting or maintaining any activity, facility or condition which is in violation of sections 22a-36 to 22a-45, inclusive, or of the regulations of the [commission], the [enforcement officer] may issue a written order, by certified mail, to such person conducting such activity or maintaining such facility or condition to cease immediately such activity or to correct such facility or condition. . . ."

As stated previously in detail, pursuant to her statutory and regulatory authority under the zoning and wetlands regulations, Williams issued a notice of violation to Sideco and, subsequently, issued a cease and desist order to the board because all erosion and sediment control measures and facilities on the school grounds were not maintained in proper working order as required by § 27.6 (c) of the town's zoning regulations and the wetlands act.[8] Although Sideco and the board were free to appeal from the notice of violation and the cease and desist order to the town's zoning board of appeals pursuant to § 30.7 of the town's zoning regulations, they chose neither to pursue their right to appeal nor to remedy adequately the erosion control measures. Consequently, the notice of violation and the cease and desist order issued by Williams was an administrative determination that constitutes sufficient proof of the violation—for CEPA purposes, conduct not in compliance with the applicable legislative and

---

[8] The standard governing the proper working order of the erosion and sediment control measures is established by the Connecticut Guidelines for Soil Erosion and Sediment Control (1985), as amended. See Haddam Zoning Regs., § 27.4; Haddam Inland Wetland and Watercourses Regs., Standard Permit Conditions, citing Connecticut Guidelines for Soil Erosion and Sediment Control.

regulatory scheme.[9] See *Haddam* v. *LaPointe*, 42 Conn. App. 631, 637, 680 A.2d 1010 (1996).

Regardless of whether such a violation exists, on appeal the defendants adopt the court's position by arguing that the notice of violation and the cease and desist order were insufficient to constitute an expert opinion establishing a link between the construction site activities and the alleged pond damage as required under CEPA. In response, the plaintiff argues that in addition to nonexpert evidence and the evidence associated with Williams, he also disclosed properly a number of experts who submitted reports discussing causation.

The plaintiff disclosed Wade Thomas, a soil scientist, who stated that the sediment delivered to the plaintiff's pond from September 1 to November 30, 2000, prior to the construction of the sediment basin, was expected to range from a minimum of approximately 5.3 tons to a maximum of approximately 14.4 tons. For the period from December 1, 2000, to October 31, 2001, subsequent to the construction of the sediment basin, the range of sediment delivered to the pond was expected to range from a minimum of approximately 4.2 tons to a maximum of approximately 11.4 tons. This testimony supports that sediment entered the plaintiff's pond, albeit in varying amounts.

---

[9] The defendants argue that Williams' opinions and any documents that she authored should not be elevated to expert status on appeal because she was not disclosed as an expert and, thus, does not qualify as such. We are not persuaded by this argument. There is a "presumption that public officials acting officially properly performed their duties. . . . This encompasses the presumption that the public official is qualified in the field wherein his or her official duties lie until the contrary is shown." (Citation omitted; internal quotation marks omitted.) *Kaesar* v. *Conservation Commission*, 20 Conn. App. 309, 320–21, 567 A.2d 383 (1989) (*Berdon, J.*, concurring). The defendants do not attack Williams' qualifications but, rather, that she was not disclosed as an expert. Accordingly, such an argument does not defeat the presumption that Williams, as a public official, is qualified in her field.

Priscilla Baillie, a wetlands biologist, noted that the considerable input of soil from the school construction project would inevitably contribute to the spread of the aquatic plants in the pond by augmenting soft sediments for rooting, by reducing the depth and by increasing available nutrients. Furthermore, Baillie stated that the nutrient sources on the plaintiff's property do not account for the poor conditions in the pond. Rather, the "[s]oil erosion and sedimentation from the school construction project, together with ongoing fertilization of the playing fields and grounds, are the most likely major sources of nutrients to this pond."

Donald Ballou, a professional engineer, opined that a storm water detention basin that primarily discharges into the plaintiff's pond should have been designed to be at least 50 percent larger to comply with the Connecticut Guidelines for Soil Erosion and Sediment Control.[10] Last, Harvey Luce, a soil scientist, stated in his reports that the primary source of the nutrients and iron that have greatly degraded the water quality of the pond came from the school grounds. In Luce's opinion, a dysfunctional detention basin located on the school grounds was the source of the high levels of ferrous iron and nutrients that were entering the stream that flows into the plaintiff's pond. As a result, Luce believed that the situation could be greatly improved by the proper treatment of all the storm water before it leaves the school property.

In light of the foregoing accumulated evidence, we find that genuine issues of material fact exist as to whether Sideco, as the contractor on the site, and the board, as the owner of the school property and Sideco's principal, unreasonably polluted the plaintiff's pond

[10] The erosion and sediment control design plan was required to comply with the Connecticut Guidelines for Soil Erosion and Sediment Control (1985). See footnote 8 of this opinion.

under CEPA. Both Sideco and the board violated the town's zoning regulations and the wetlands act. Because the facts, as set out in the court's memorandum of decision, do not support the legal conclusions the court reached, we conclude that the court improperly granted the motions for summary judgment filed by Sideco and the board as to the CEPA counts.

## B

### Roming

Although Williams did not issue Roming a notice of violation or a cease and desist order, the plaintiff argues that a material issue of fact exists with regard to whether Roming's conduct, in concert with that of Sideco, resulted in the unreasonable pollution of the plaintiff's pond. We agree with the plaintiff.

John DiBacco, the president of Sideco, testified that "[a]ccording to the [specifications], we would take direction from Mark Roming Associates."[11] DiBacco stated that he could not recall ever taking direction from the board. Furthermore, Sideco was obligated contractually to conform to the requirements of the erosion and sediment control plan that Roming drafted. In fact, DiBacco stated that Roming instructed Sideco not to start construction on the site until the silt fence was installed. Viewing the inferences drawn from these facts in the light most favorable to the plaintiff, Roming possessed a supervisory role over Sideco in addition to its role as designer of the erosion and sediment control plan.

---

[11] The defendants argue that because DiBacco was not disclosed as an expert, his testimony should not be considered as expert testimony. DiBacco's testimony, however, was not of the expert variety. Furthermore, we note that in technically complex matters, expert testimony is not the only acceptable evidence that can be offered. See *Kaesar* v. *Conservation Commission*, 20 Conn. App. 309, 314, 567 A.2d 383 (1989).

The plan that Roming designed as part of the permit process required all erosion control measures and procedures to be in accordance with the Connecticut Guidelines for Soil Erosion and Sediment Control (1985). Accordingly, Roming's plan required a siltation fence or stacked hay bales to be maintained in effective operating condition throughout the construction process. Additionally, the plan required Sideco, as the general contractor, to perform the following duties: (1) install hay bale-geotextile fabric filters as detailed at all catch basins, lawn drains, etc., after they have been constructed and not to remove them until all sources of erosion have been permanently stabilized; (2) inspect all erosion control measures immediately after each rainfall, and at least daily during prolonged rainfall, in order to repair any damaged control measures; and (3) remove sediment deposits when they reach approximately one-half the height of the barrier.

Because the erosion and sediment control measures were not maintained in working order, Williams issued the notice of violation and the cease and desist order. Not only were the control measures not maintained, but Sideco deliberately slit holes in the geotextile fabric filters that covered the drains, allowing sediment laden water to flow into the plaintiff's pond. Evidence also exists showing that the erosion and sediment controls were not functioning properly well after the issuance of the cease and desist order. This evidence, construed in a light most favorable to the plaintiff, establishes a genuine issue of material fact as to whether Roming's supervision, or lack thereof, over Sideco's maintenance of the erosion controls complied with the legislative and regulatory scheme enacted to protect the plaintiff's pond.

Furthermore, despite Roming's expressed commitment that the erosion control measures and procedures shall be in accordance with the Connecticut Guidelines

for Soil Erosion and Sediment Control (1985), Ballou opined that a storm water detention basin that primarily discharged into the plaintiff's pond should have been designed to be at least 50 percent larger. He stated that an additional storm water detention basin that discharges into the pond was undersized. Ballou also observed two basins that possessed inappropriate outlet works, and, consequently, these basins appeared to be most likely not fulfilling their primary design function of metering the outflow along with retaining sediment and floatables. Ballou pointed out that the deficiencies at the site should have been included in the plans for improvement at the school property in accordance with the guidelines—a requirement mandated by the regulations. Furthermore, Luce connected the erosion control measures on the school grounds with the pond damage by stating that, in his opinion, a dysfunctional detention basin was the source of the high levels of ferrous iron and nutrients that flowed into the stream and then into the plaintiff's pond, degrading the water quality.[12]

Construed in a light most favorable to the plaintiff, the foregoing evidence also established a genuine issue of material fact as to whether Roming's design of the erosion and sediment control plan complied with the legislative and regulatory scheme enacted to protect

---

[12] The defendants argue that the record does not support this alleged link between the reports of Ballou and Luce because it is nothing more than conjecture or speculation as to what basin Luce referred to as dysfunctional in his report. The record, however, does reveal that Ballou recommended in his report that two detention basins should be enlarged—one that exists in a subdrainage area that flows directly to the pond, while the other flows into a large wetlands area that abuts the school grounds. Luce referred to a dysfunctional detention basin in his report that drains into a stream that, in turn, drains into the pond. We conclude that the evidentiary link between the dysfunctional basin identified by both Ballou and Luce and the resulting pond damage discussed by Luce is not mere conjecture or speculation but an inference to be drawn from the facts in the light most favorable to the plaintiff.

bodies of water such as the plaintiff's pond. Accordingly, we hold that the court improperly granted Roming's motion for summary judgment on the CEPA count.

## II

## NEGLIGENCE COUNTS

The plaintiff next claims that the court should not have granted the motions for summary judgment filed by Sideco, the board and Roming on the negligence counts because the court failed to graft the regulatory permit standard of care under CEPA onto the negligence counts as well. As such, the plaintiff argues that the court failed to analyze these counts under a framework of negligence per se and, consequently, failed to conclude that issues of material fact exist.[13] We agree with the plaintiff.

We first note that research on this issue reveals that the question of whether § 22a-16 of CEPA imposes a standard of care on the defendants, the violation of which constitutes negligence per se, is a matter of first impression for this court. "[T]he existence of a duty of care is an essential element of negligence. . . . A duty to use care may arise from a contract, from a statute, or from circumstances under which a reasonable person, knowing what he knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result from his act or failure to act." (Internal quotation marks omitted.) *Pelletier* v. *Sordoni/*

---

[13] Although the plaintiff formulated his arguments before the court as grounded in negligence per se, the court did not directly address the negligence per se argument in its memorandum of decision. Rather, it appears that the court rejected the negligence per se liability theory and instead stated that Connecticut case law indicates that "[c]ommon sense may not be substituted for expert testimony on the highly technical subject of how upland construction activity would impact a wetland." (Internal quotation marks omitted.) Without the necessary expert testimony, the court concluded that no genuine issue of material fact existed and, thus, granted the defendants' motions for summary judgment.

*Skanska Construction Co.*, 286 Conn. 563, 578, 945 A.2d 388 (2008). "Negligence per se operates to engraft a particular legislative standard onto the general standard of care imposed by traditional tort law principles, i.e., that standard of care to which an ordinarily prudent person would conform his conduct. To establish negligence, the jury in a negligence per se case need not decide whether the defendant acted as an ordinarily prudent person would have acted under the circumstances. [It] merely decide[s] whether the relevant statute or regulation has been violated. If it has, the defendant was negligent as a matter of law." (Internal quotation marks omitted.) *Considine* v. *Waterbury*, 279 Conn. 830, 860–61 n.16, 905 A.2d 70 (2006).

Generally, our courts have treated a statutory violation as negligence per se "in situations in which the statutes or city ordinances at issue have been enacted for the purpose of ensuring the health and safety of members of the general public." *Pickering* v. *Aspen Dental Management, Inc.*, 100 Conn. App. 793, 800, 919 A.2d 520 (2007). "The majority of cases concluding that a statutory provision implicates the doctrine of negligence per se have arisen in the context of motor vehicle regulation. See, e.g., *Velardi* v. *Selwitz*, 165 Conn. 635, 639, 345 A.2d 527 (1974); *Busko* v. *DeFilippo*, 162 Conn. 462, 466, 294 A.2d 510 (1972); *Bailey* v. *Bruneau's Truck Service, Inc.*, 149 Conn. 46, 54, 175 A.2d 372 (1961). Such a history, however, should not be read to suggest that the negligence per se doctrine is relevant only in the context of statutes pertaining to motor vehicles." *Gore* v. *People's Savings Bank*, 235 Conn. 360, 378, 665 A.2d 1341 (1995).

Rather, the two-pronged test applied to establish negligence per se is: (1) that the plaintiff was within the class of persons protected by the statute; and (2) that the injury suffered is of the type that the statute was intended to prevent. Id., 368–69. "In deciding whether

the legislature intended to provide for such statutory liability, we look to the language of the statute and to the legislative history and purposes underlying the provision's enactment." Id., 380.

With those principles in mind, we now turn to discuss CEPA directly. CEPA was enacted by the legislature to "enable persons to seek redress in the court when someone is [polluting] our environment." Conn. Joint Standing Committee Hearings, supra, p. 163, remarks of Wade, counsel for the majority leadership in the House of Representatives; see also *Waterbury* v. *Washington*, supra, 260 Conn. 532. Section 22a-16 provides in relevant part: "[A]ny person . . . may maintain an action in the superior court . . . for declaratory and equitable relief against . . . any person, partnership, corporation, association, organization or other legal entity, acting alone, or in combination with others, for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction . . . ." As previously stated, our Supreme Court has determined that "when there is an environmental legislative and regulatory scheme in place that specifically governs the conduct that the plaintiff claims constitutes [unreasonable pollution] under CEPA, whether the conduct is unreasonable under CEPA will depend on whether it complies with that scheme." *Waterbury* v. *Washington*, supra, 557.

In the present case, the wetlands act and the town's zoning regulations provide substantive content in determining what constitutes unreasonable pollution. The wetlands act, and the town's zoning and wetlands regulations promulgated thereunder are designed "for the protection, preservation, maintenance and use of the inland wetlands and watercourses by minimizing their disturbance and pollution . . . preventing damage from erosion, turbidity or siltation . . . [and for]

protecting the quality of wetlands and watercourses
. . . ." General Statutes § 22a-36. Under the two-
pronged statutory test, the plaintiff in this case, who
alleges damage to his pond caused by erosion, turbidity
and siltation from nonfunctioning erosion and sediment
control measures on the school grounds, is within the
class of persons protected by the statute. Furthermore,
on the basis of our Supreme Court's interpretation of
unreasonable pollution, we also conclude that the
alleged injury suffered by the plaintiff is of the type
that CEPA intended to prevent—in this case, continued
violations of the applicable regulatory scheme govern-
ing conduct on the school grounds construction site.

Additionally, although the purposes behind the wet-
lands act and the town's zoning and wetlands regula-
tions—and, thus, CEPA in this case—support the
application of statutory liability pursuant to the negli-
gence per se doctrine, it also is important that here, it
is the town's regulatory scheme that determines what
constitutes unreasonable pollution under CEPA. Under
Connecticut law, the violation of a valid administrative
regulation constitutes negligence per se. See, e.g., *Citer-
ella* v. *United Illuminating Co.*, 158 Conn. 600, 608, 266
A.2d 382 (1969); *Hyde* v. *Connecticut Co.*, 122 Conn.
236, 240, 188 A. 266 (1936); *Heritage Village Master
Assn., Inc.* v. *Heritage Village Water Co.*, 30 Conn. App.
693, 705, 622 A.2d 578 (1993). In light of the foregoing,
we conclude that § 22a-16 imposes on the defendants
a standard of care, the violation of which constitutes
negligence per se.[14]

---

[14] We note that a "court's interpretation that a statute provides for negli-
gence per se ordinarily does not lead to the further conclusion that the
statute prohibits excuses." *Gore* v. *People's Savings Bank*, supra, 235 Conn.
382. Our Supreme Court has stated that CEPA does not prohibit excuses.
"It is reasonable to conclude . . . that when the legislature has enacted a
specific statutory scheme concerning conduct that is later complained of,
it also intended that a party be able to offer evidence of compliance with
that statute which, if believed, would rebut a prima facie showing under
CEPA. Therefore, we do not interpret the term 'unreasonable' in such a way
as to relegate defendants in CEPA actions to the sole affirmative defense that

As a result, the issue before us is whether a genuine issue of material fact exists as to whether Sideco, the board and Roming are liable under a negligence per se cause of action. "To prove negligence per se, a plaintiff must show that the defendant breached a duty owed to her and that the breach proximately caused the plaintiff's injury." *Pickering* v. *Aspen Dental Management, Inc.*, supra, 100 Conn. App. 802. We already determined in part I of this opinion that material issues of fact exist concerning whether the defendants violated the standard of care owed under CEPA. Thus, the last inquiry under the negligence per se analysis is whether these violations proximately caused the damage to the plaintiff's pond.

"[A] plaintiff must establish that the defendant's conduct legally caused the injuries. . . . The first component of legal cause is causation in fact. Causation in fact is the purest legal application of . . . legal cause. The test for cause in fact is, simply, would the injury have occurred were it not for the actor's conduct. . . . The second component of legal cause is proximate cause. . . . [T]he test of proximate cause is whether the defendant's conduct is a substantial factor in bringing about the plaintiff's injuries. . . . Further, it is the plaintiff who bears the burden to prove an unbroken sequence of events that tied his injuries to the [defendants' conduct]. . . . The existence of the proximate cause of an injury is determined by looking from the injury to the negligent act complained of for the necessary causal connection. . . . This causal connection must be based upon more than conjecture and surmise." (Internal quotation marks omitted.) *Burton* v. *Stamford*, 115 Conn. App. 47, 75 n.18, 971 A.2d 739, cert. denied, 293 Conn. 912, 978 A.2d 1108 (2009).

---

there was no feasible and prudent alternative to their conduct." *Waterbury* v. *Washington*, supra, 260 Conn. 560.

Given our review of the causation evidence in part I of this opinion, the issue of legal causation as to each defendant requires little discussion. The record supports that it is uncontroverted that the plaintiff's pond was clear and in pristine condition before the construction activities began. After construction began, however, large quantities of storm water runoff containing silt, rocks, bacteria and other waterborne substances continued to flow from the school property into the plaintiff's pond and surrounding wetlands. Not only has a considerable amount of sediment flowed into the pond, but murky water, iron floc on the pond's surface and sizeable beds of rooted aquatic plants have also appeared.[15]

Additionally, the plaintiff offered evidence from the following individuals that we discussed in detail in part I of this opinion: Williams, the zoning and wetlands enforcement officer; Dworetzky, a natural resource specialist at the Middlesex County Soil and Water Conservation District, Inc.; Thomas, a soil scientist; Baillie, a wetlands biologist; Ballou, a professional engineer; and Luce, a soil scientist. Together, this evidence, taken in the light most favorable to the plaintiff, creates a genuine issue of material fact as to whether the damage to the plaintiff's pond would have occurred if it were not for each defendant's conduct. Furthermore, issues of material fact also exist as to whether the damage to the pond was proximately caused by Sideco's alleged negligent acts as the contractor on the school grounds, the board's alleged negligent acts as the owner of the school grounds and Roming's alleged negligent acts as Sideco's supervisor and as the designer of the erosion and sediment control plan.

---

[15] Given the alleged unreasonable pollution to the plaintiff's pond, Ballou provided a report to the plaintiff dated July 17, 2006, that estimates that the engineering and dry dredging costs of the pond would be $450,877.

In light of all the evidence, both from experts and nonexperts, we simply cannot find that a fair and reasonable person could conclude only one way in this case. Under Connecticut law, we are required to hold the movant to a strict standard under which a showing must be made that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. See *DaGraca* v. *Kowalsky Bros., Inc.*, supra, 100 Conn. App. 785. Given such a strict standard, we conclude that the court improperly granted the defendants' motions for summary judgment on the negligence counts.

Before closing our negligence discussion, we note that although we base our decision on the negligence per se liability standard, the "failure to conform one's conduct to a standard of duty prescribed by legislative authority, or to conform it to the common-law requirement to exercise reasonable care under the circumstances, constitutes negligence, and it makes no essential difference in law whether it arises from the one source or the other." *Farrington* v. *Cheponis*, 84 Conn. 1, 8–9, 78 A. 652 (1911). Thus, we also conclude that a genuine issue of material fact exists as to whether the defendants acted with the reasonable care required under principles of common-law negligence. Sideco, the board and Roming, either directly or indirectly, owed a duty under the regulations to protect the plaintiff's pond. We find that a genuine issue of material fact exists as to whether each defendant acted reasonably in first allegedly violating the permitting scheme and then in failing to remedy the erosion and sediment control measures adequately.

## III

## NUISANCE COUNTS

Additionally, the plaintiff claims that the court improperly granted the motions for summary judgment

filed by Sideco and the board on the private and public nuisance counts against them. We agree.

We begin by noting that a private nuisance and a public nuisance represent distinct causes of action. "[I]n order to recover damages in a common-law private nuisance cause of action, a plaintiff must show that the defendant's conduct was the proximate cause of an unreasonable interference with the plaintiff's use and enjoyment of his or her property. The interference may be either intentional . . . or the result of the defendant's negligence. . . . Whether the interference is unreasonable depends upon a balancing of the interests involved under the circumstances of each individual case. In balancing the interests, the fact finder must take into consideration all relevant factors, including the nature of both the interfering use and the use and enjoyment invaded, the nature, extent and duration of the interference, the suitability for the locality of both the interfering conduct and the particular use and enjoyment invaded, whether the defendant is taking all feasible precautions to avoid any unnecessary interference with the plaintiff's use and enjoyment of his or her property, and any other factors that the fact finder deems relevant to the question of whether the interference is unreasonable. No one factor should dominate this balancing of interests; all relevant factors must be considered in determining whether the interference is unreasonable." (Citations omitted.) *Pestey* v. *Cushman*, 259 Conn. 345, 361, 788 A.2d 496 (2002). The reasonableness of the interference ultimately comes down to whether it "is beyond that which the plaintiff should bear, under all the circumstances of the particular case, without being compensated." Id., 362.

To prevail in a claim for public nuisance, however, a plaintiff must prove the following elements: "(1) the condition complained of had a natural tendency to create danger and inflict injury upon person or property;

(2) the danger created was a continuing one; (3) the use of the land was unreasonable or unlawful; [and] (4) the existence of the nuisance was the proximate cause of the plaintiffs' injuries and damages." (Internal quotation marks omitted.) Id., 355. In addition, the plaintiff must prove that "the condition or conduct complained of interferes with a right common to the general public. . . . Nuisances are public where they . . . produce a common injury . . . . The test is not the number of persons annoyed, but the possibility of annoyance to the public by the invasion of its rights. A public nuisance is one that injures the citizens generally who may be so circumstanced as to come within its influence." (Citation omitted; internal quotation marks omitted.) *Boyne* v. *Glastonbury*, 110 Conn. App. 591, 606, 955 A.2d 645, cert. denied, 289 Conn. 947, 959 A.2d 1011 (2008).

"Whether an interference is unreasonable in the public nuisance context depends . . . on (a) [w]hether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or (b) whether the conduct is proscribed by [law] . . . . 4 Restatement (Second), [Torts § 821B (1979)]. The rights common to the general public can include, but certainly are not limited to, such things as the right to use a public park, highway, river or lake. Id., § 821D, comment (c)." (Internal quotation marks omitted.) *Pestey* v. *Cushman*, supra, 259 Conn. 356 n.5.

We conclude that genuine issues of material fact exist with regard to both the private and public nuisance counts against Sideco and the board. We already determined that issues of material fact exist concerning the alleged violation of CEPA and the negligent conduct of Sideco and the board, which included a discussion of legal causation. Additionally, evidence in the record suggests intentional conduct by Sideco, the board's

agent. After the notice of violation was issued to Sideco and the cease and desist order was issued to the board, Dworetzky inspected the school grounds. She determined that storm water had eroded the exposed sediment on the site and deposited it in the stream that leads from the site to the plaintiff's pond. She observed the stream flowing over the silt fences and hay bales that had been put in place to prevent the sediment from traveling downstream. She also stated that fabric covering the drains on the site, which discharge water to detention basins as well as directly to the surrounding wetlands in the area, had previously been intentionally slit by Sideco to allow water to enter the drains unimpeded. As a result, sediment from exposed fields could continue to enter the drain freely, flow into the stream and subsequently into the plaintiff's pond and the surrounding wetlands.

Thus, the record reveals that Sideco and the board both received notification that their conduct was in violation of the town's zoning regulations. Despite such notification, testimony from experts and nonexperts alike revealed that inadequate erosion and sediment control measures persisted on the site, allowing sediments to flow from the site to the plaintiff's pond as well as the surrounding wetlands, which the public has an interest both in protecting and in utilizing for recreation and other purposes.[16] When the plaintiff pur-

---

[16] To illustrate the common injury caused by the pollution of a wetland, it is useful to examine how our Supreme Court has framed the purpose of the wetlands act, the act pursuant to which the town's zoning and wetlands regulations were promulgated. In *Queach Corp.* v. *Inland Wetlands Commission*, 258 Conn. 178, 193, 779 A.2d 134 (2001), the Supreme Court stated that "[t]he inland wetlands and watercourses of the state of Connecticut are an indispensable and irreplaceable but fragile natural resource with which the citizens of the state have been endowed, and that [t]he preservation and protection of the wetlands and watercourses from random, unnecessary, undesirable and unregulated uses, disturbance or destruction is in the public interest and is essential to the health, welfare and safety of the citizens of the state." (Internal quotation marks omitted.) Id.

chased the property, the pond was clear and the surface was free of vegetation. The pond served not only as a visual asset of the plaintiff's property but was also used for swimming, fishing and other recreation. After construction began, however, not only has a considerable amount of sediment flowed into the pond, but murky water, iron floc on the pond's surface and sizeable beds of rooted aquatic plants have also appeared. The cumulative evidence in this case linked the erosion and sediment control measures, which the defendants in different capacities were responsible for maintaining, with the money damages. As a result, the court improperly granted Sideco's and the board's motions for summary judgment on the nuisance counts.

## IV

## EXPERT DISCLOSURES

Finally, the plaintiff claims that if this court on appeal determines that additional expert testimony is necessary to survive the defendants' motions for summary judgment, the court abused its discretion in not allowing his experts to supplement their disclosures during discovery fifteen months prior to trial. Because we determined that the court improperly granted the defendants' motions for summary judgment in light of the evidence before it, we need not address this evidentiary issue regarding supplemental expert disclosures.

The judgment is reversed in part and the case is remanded for further proceedings in accordance with law.

In this opinion the other judges concurred.